1    **UNITED STATES DISTRICT COURT**

2    **DISTRICT OF NEVADA**

3    * * *

4    CHARLES MORRIS,                              Case No. 3:18-CV-0310-RCJ-CLB

5                            Plaintiff,        **REPORT AND RECOMMENDATION**
                                              **OF U.S. MAGISTRATE JUDGE[1]**
6        v.
                                              [ECF Nos. 65, 83]
7    ROMEO ARANAS, *et al.*,

8                            Defendants.

9

10          This case involves a civil rights action filed by Plaintiff Charles Morris ("Morris")

11   against Defendants Romeo Aranas ("Aranas"), Isidro Baca ("Baca"), Shelly Conlin

12   ("Conlin"), Richard Long ("Long"), David Mar ("Mar"), Melissa Mitchell ("Mitchell"), and

13   William Miller ("Miller") (collectively referred to as "Defendants"). Currently pending before

14   the Court is Defendants' motion for summary judgment. (ECF Nos. 65, 66, 68.)[2] Morris

15   opposed the motion, (ECF Nos. 75, 76), and filed a cross-motion for summary judgment,

16   (ECF Nos. 75, 76, 82, 83).[3] Defendants opposed Morris's cross-motion, (ECF No. 84),

17   and Morris filed a reply in support of his cross-motion. (ECF No. 89). Defendants did not

18   file a reply in support of their motion. For the reasons stated below, the Court recommends

19   that Defendants' motion for summary judgment, (ECF No. 65), be denied, and Morris's

20   cross-motion for summary judgment, (ECF No. 83) be denied.

21   ///

22   ///

23   _____

[1]      This Report and Recommendation is made to the Honorable Robert C. Jones,
24   United States District Judge. The action was referred to the undersigned Magistrate
     Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

25
[2]      ECF No. 66 is a 220-page appendix of exhibits to the motion. ECF No. 68
26   comprises sealed medical record exhibits.

27   [3]      ECF No. 75 is Morris's opposition and cross-motion for summary judgment. ECF
     No. 76 consists of exhibits filed in support of Morris's opposition and cross-motion. ECF
     Nos. 82 and 83 are duplicate copies of ECF Nos. 75 and 76, the opposition, cross-motion,
28   and exhibits.

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Morris is an inmate in the custody of the Nevada Department of Corrections ("NDOC") and is currently housed at Northern Nevada Correctional Center ("NNCC"). Morris initiated this action on June 27, 2018. (ECF No. 1.) He submitted a civil rights complaint pursuant to 42 U.S.C. § 1983 against multiple Defendants for events that took place while he was incarcerated.[4] (ECF No. 43). Morris's second amended complaint, which is the operative complaint in this case, includes two claims. The first is an Eighth Amendment deliberate indifference to serious medical needs claim against Defendants Aranas, Long, Mitchell, and Mar, and the second is an Eighth Amendment deliberate indifference to serious threats to inmate's safety claim against Defendants Baca, Miller, and Conlin. (*Id.*)

In Count I, Morris alleges the following: prison officials knew Morris had serious back problems and, thus, repeatedly transferred him to prisons with flat yards and to the regional medical center. Prison officials appeared to delay medical treatment by refusing to provide MRIs to confirm Morris's back injuries and then delayed/denied surgery once an MRI confirmed the need for surgery. Instead of surgery, prison officials issued Morris a walker and cane. Morris's delay in treatment led to his legs collapsing and seriously injuring himself on the stairs, which further led to the need for emergency surgery. (*Id.* at 6-16.)

In Count II, Morris alleges the following: prison officials knew for 15 years that Morris was classified to a lower tier, lower bunk restriction due to his spinal issues and need to use a walker and cane. However, in 2018, prison officials explicitly ordered Morris to a top tier and refused to move Morris to a lower tier until he fell down the stairs and partially paralyzed himself. (*Id.* at 17-19.)

---

[4]    Morris was transferred five times between four facilities (NNCC, Lovelock Correctional Center, Ely State Prison, and High Desert State Prison) throughout the time period of his complaint, as will be more fully discussed below. (*See* ECF No. 66-1 at 80-81.)

On June 21, 2021, Defendants filed a motion for summary judgment arguing they were not deliberately indifferent to Morris's serious medical needs or threats to his safety, they are entitled to qualified immunity, several Defendants lack personal participation, no NDOC personnel created an unsafe condition, Morris is not entitled to injunctive relief, and he failed to exhaust his administrative remedies. (ECF No. 65.) Morris opposed the motion and filed a cross-motion for summary judgment, (ECF Nos. 75, 83). Morris moves for summary judgment on his unsafe prison conditions claim, only. (*See id.*) Defendants opposed Morris's cross-motion, (ECF No. 84), and Morris filed a reply in support of his cross-motion for summary judgment. (ECF No. 89). Defendants did not file a reply in support of their motion for summary judgment.

## II.    UNDISPUTED FACTS

### A.    Medical History re: Back Pain[5]

During Morris's intake at ESP on October 19, 1999, Morris appears to have first reported his back problems to the NDOC. (ECF No. 66-1 at 42.) On January 12, 2015 and January 20, 2015, Morris filed two kites stating he was "offered surgery some years back" that he declined.[6] (*Id.* at 6-7.) Defendants claim Morris did not produce evidence of the referral for surgery nor sign a HIPAA release to obtain these records.[7]

After filing these kites, Morris was told he would be scheduled to see a physician. (*Id.* at 6.) Morris had x-rays done on February 20, 2015 and requested the results on March 8, 2015. (ECF No. 68-5 at 11-12, ECF No. 66-1 at 4.) On March 18, 2015, a request

---

[5]    Defendants only include copies of Morris's medical kites from January 2015 to October 2019, (ECF Nos. 66 at 37-110, 66-1 at 1-8), his medical consultation reports from March 2015 to October 2019, (ECF No. 68-1), physician's orders from November 2014 to October 2019, (ECF No. 68-3), and progress notes from January 2015 to October 2019, (ECF No. 68-4).

[6]    NDOC claims to have no records of any prior offer of surgery to Morris and Morris did not specify any further details on this offer.

[7]    It is unclear why a HIPAA release would be necessary to obtain these medical records, as Morris has been in NDOC custody continuously since 1999 and these records should already be in the NDOC's possession.

was made by an NDOC practitioner for Morris to have an MRI and surgery; therefore, an appointment was made for Morris to see Dr. Long, an orthopedic surgeon. (ECF No. 68-1 at 46.)

Morris was seen by Dr. Long on May 13, 2015, for low back pain. (*Id.* at 45.) Following the examination, Dr. Long stated he could not "make any determination … [and] was unable to isolate any significant objective findings, only subjective complaints." (*Id.*) Dr. Long further stated he was "not sure about recommending an MRI." (*Id.*) On June 19, 2015, Morris submitted a kite requesting information about what Dr. Long had ordered following his examination. (ECF No. 66-1 at 1.) Morris was told that Dr. Long did not order anything and quoted his lack of findings. (*Id.*)

Morris submitted multiple kites in 2015 and 2016 concerning his back pain. (ECF No. 66 at 71-110; ECF No. 66-1 at 1-8.) On November 30, 2015, a MRI was requested and performed on February 16, 2016, which indicated "disc herniation at L4-L5 . . . [and] foraminal stenosis. . . .". (ECF No. 68-1 at 43, ECF No. 68-5 at 10.) Thereafter, Dr. Vicuna requested a "spine surgeon" on March 18, 2016. (ECF No. 68-1 at 40.) The request was authorized by the UR Panel on March 29, 2016. (*Id.*) On May 12, 2016, Morris submitted a "second request" to be seen following his MRI and was told to "wait for an appointment." (ECF No. 66 at 94.)

On May 20, 2016, Morris filed an informal grievance concerning the requested back surgery, his pain level, numbness in his legs, inability to stand for periods of time, and claiming he was collapsing and falling and having trouble using the restroom due to his back. (ECF No. 66 at 16-22.)  Morris's grievance alleged that he was being transferred between facilities even though he required a "medical flat yard." (*Id.*) It appears from Morris's bed assignment records that from January 27, 2015 until May 20, 2016, the date of the grievance, Morris was transferred four times between several facilities. (ECF No. 66-1 at 80.) In March of 2016, Morris alleged he was being transferred to different NDOC facilities to delay his treatment. (ECF No. 66 at 5-22.) However, on September 19, 2016, Morris stated he was transferred from SDCC to NNCC due of "extreme back pain"

1    because "SDCC couldn't help." (ECF No. 66 at 83.)

2        On August 3, 2016, Morris submitted a medical kite stating his condition was

3    "worsening fast" and he had "non-stop pain." (ECF No. 66 at 86.) NDOC's response was

4    to use a form response on the kite which states, "The Medical schedule is based on

5    priority needs and the current waiting time; you will be seen in 2–4 weeks. If your condition

6    worsens, please submit a kite for nursing sick call." (*Id.*)

7        Morris was seen for his back pain on August 12, 2016 by Michael Schneier, M.D.

8    ("Schneier") of the Khavkin Clinic, NDOC's outside medical provider at the time. (ECF No.

9    68-1 at 31.) Schneier noted that Morris had tried the medication "Medrol Dosepak without

10   remediation of symptoms . . . and Morris had an MRI." (*Id.*) Schneier's assessment was

11   degenerative disc disease lumbar, pain lumbar and spondylolysis lumbar. (*Id.* at 31.)

12   Schneier ordered a "lumbar MRI w/o con – open" and a "pain a management

13   consultation." (*Id.*) Schneier also noted that "further discussion regarding the surgical

14   planning will be based on a review of hard copy of the MRI with possible need to refer for

15   open MRI." (*Id.*) Schneier's plan was to treat him with facet and transforaminal injections

16   at L4-L5. (*Id.*)

17       Morris claims he was issued a walker and a cane on October 7, 2016. (ECF No. 6

18   at 13.) Morris filed a medical kite on November 21, 2016 about his back pain and asking

19   for help with pain management. (ECF No. 66 at 74.) Morris further complained that he

20   was constantly being told to "lose some weight and 100 lbs at that but how can I lose 100

21   lbs when at most times I can't even walk? Help me lost the weight because I desperately

22   need this surgery because I'm in constant pain 24/7. . . ." (*Id.*)

23       On January 25, 2017, an NNCC practitioner requested that Morris be seen by

24   Long. (ECF No. 68-1 at 30.) The practitioner noted that Morris "is in need of surgery, but

25   not until he loses weight." (*Id.*) On June 14, 2017, Morris was seen by Long for his "severe

26   lumbar spinal stenosis, with pain radiating down into his lower extremities, and decreased

27   sensation and marked weakness, particularly with ambulation." (*Id.* at 29.) Long also

28   noted that since he had last seen Morris, in March 2017, Morris had fallen twice. (*Id.*)

Long recommended that Morris "continue walker with chair" and stated "an epidural may give very temporary relief" and "[p]erhaps a neurosurgical evaluation could be considered." (*Id.*) The recommendations stated that Morris may continue with walker, and an epidural "may" give temporary relief. *Id.* It continues to recommend "a neurosurgical evaluation could be considered." (*Id.*)

On June 28, 2017, Morris was referred to Sierra Neurosurgery for "eval/treatment." on June 28, 2017. (*Id.* at 28.) On October 13, 2017, Sierra Neurosurgery requested an updated MRI before scheduling an appointment with Morris. (*Id.* at 26.) On November 2, 2017, Morris sent a medical kite stating he was told "a few months ago" that he was "put in for back surgery" and was wondering the status as he was "still in grave pain." (ECF No. 66 at 57.) The response to the kite states "seen by Sierra Neurosurgery & surgery completed" with a date of February 8, 2018. (*Id.*)

On February 2, 2018, correctional officers called a "man-down" after Morris fell down the stairs in his housing unit. (ECF No. 68-4 at 11, ECF No. 68-8 at 3, ECF No. 66-1 at 83.) Morris stated his leg "gave out" and it felt like something was "sticking in his back." (ECF No. 68-4 at 11.) Morris was taken by ambulance to Carson Tahoe Hospital and then transferred to Renown Hospital where he had emergency back surgery performed on February 3, 2018 by Dr. Song—NDOC's outside medical provider at the time—for a "massive L4-L5 dis[c] herniation with dense bilateral paraparesis." (ECF No. 68-1 at 16.)  Morris was seen post-operatively on February 23, 2018, where Morris reported complete relief of right lower extremity pain, some shooting pain in the left lateral thigh, weakness and numbness in the left foot and significant spasms in the low back and left leg. (ECF No. 68-1 at 14.) A discussion was had about weaning Morris off narcotic pain mediation at 90 days post-op. (*Id.* at 15.)

On March 12, 2018, Morris kited about numbness and pain in his left leg and foot along with "bad spasms" causing pain. (ECF No. 66 at 53.) On March 21, 2018, Morris kited about being in pain, and was seen on March 28, 2018. (ECF No. 66 at 51, ECF No. 68-3 at 8.)  Several orders were entered for medication between April 2018 and November

2018. (ECF No. 68-3 at 7.) On December 20, 2018, an NDOC practitioner requested a "consult post L4-L5 disc bulge repair for pain continuing since operation." (ECF No. 68-1 at 12.)

On or about April 4, 2019, Dr. Song requested an MRI prior to Morris's next visit, and the MRI was taken on May 28, 2019. (ECF No. 68-1 at 4-11, ECF No. 68-5 at 2-3.) On April 8, 2019, Morris filed an emergency grievance regarding continuous stabbing pain in his back. (ECF No. 68-7 at 6.)

On June 04, 2019, Morris was seen by a physician assistant ("PA") of Dr. Song at Advanced Neurosurgery for low back pain and left lower extremity symptoms. (ECF No. 68-1 at 4-7.) Dr. Song compared Morris's May 28, 2019 MRI with his February 2, 2018 MRI. (ECF No. 68-5 at 2-3.) The PA's assessment explained that Morris was overall improved in his symptoms and that his "right lower extremity symptoms" were completely resolved. (ECF No. 68-1 at 6.) The assessment noted, Morris had "chronic neurological defect in his left lower extremity including left foot drop as well as weakness, tingling and numbness and chronic pain." (*Id.*) For this, he was recommended a consult to rehab without any additional surgical intervention or diagnostic testing at the time. (*Id.*)

### B.    Medical Classification and Housing

Morris's offender information summary ("OIC") shows that on October 19, 1999, when Morris went through initial intake at ESP, he had a lower bunk restriction per medical. (ECF No. 66-1 at 42.) During a reclassification on October 14, 2002, Morris's OIC again notes that Morris "requires a lower bunk due to problems with his lower back." (*Id.* at 45.) A reclassification held on August 26, 2005 at Nevada State Prison ("NSP") notes placement on "lower tier." (*Id.* at 48.) A reclassification/periodic review held on October 2, 2008 notes Morris "requires a medical bottom bed." (*Id.* at 51.) A reclassification/periodic review held on March 20, 2009, notes Morris requires "a medical bottom bed." (Id.) A reclassification held on June 19, 2009 notes Morris "requires a medical bottom bed" and also has been issued a cane from medical. (*Id.*) A general case note entered in Morris's OIC on May 27, 2010 states Morris "has lower bunk restriction."

(*Id.* at 52.) Entries on March 31, 2011, April 6. 2011, May 25, 2011, and October 13, 2011 again state Morris has a lower bunk/lower tier restriction. (*Id.* at 54-55.) A general case note entered on June 26, 2014 states "Added Disability-Bottom Bunk Alert per 10/11/11 Medical Restriction." (*Id.* at 56.) A reclassification note entered on June 23, 2016 states: "severe medical/mobility issues." (*Id.* at 58-59.) The last explicit reference in the OIC to Morris's lower bunk/lower-tier restriction before the incident at issue is noted on September 15, 2016. (*Id.* at 59.)

Defendants include as exhibits health classification and restriction forms for May 2015, August 2016, January 2017, and February 2017. (ECF Nos. 68-2.) Each of these check-box forms indicate both lower bunk and lower floor/no stair medical restrictions. (*Id.*) The lower bunk restriction is number 9 and lower floor/no stairs restriction is number 10. (*Id.*) In reviewing Morris's OIC, Morris has consistently had a lower bunk/lower floor medical restriction noted since 1999. (ECF No. 66-1 at 42.) A review of records conducted on July 28, 2017 notes "Med rest – 2/3, 5, 11, 9, 8, 10" (*Id.* at 59), which the Court interprets to mean medical restriction 9 and 10, i.e., lower bunk and lower floor restrictions. A reclassification entry on February 6, 2018 states "MED – 2/3, 5, 11, 9, 8, 10" (*Id.* at 60.)

On October 6, 2017, an officer found a cell phone and a charger inside Morris's pillow, and he was served with a notice of charges. (ECF No. 66-1 at 41, 60, 86.) On October 6, 2017, Morris was taken by other officers to a cell located on a top tier and on a top bunk. (ECF No. 66-1 at 81.) Morris claims he complained on the way to the cell that he had a bottom-tier classification and was not to be housed upstairs. (ECF No. 76 at 7.) Morris was disciplined for the cell phone incident. (*Id.* at 15, 60.) Lt. Miller was the charging officer at Morris's disciplinary hearing. (ECF No. 66 at 35; ECF No. 66-1 at 91.) Miller submitted a declaration stating he was not involved in assigning Morris's bunk. (ECF No. 66; ECF No. 66-1 at 91- 93.) However, Baca asserted in a response to a request for interrogatory that "the bed move sheet and change of classification would have been completed by Lt. Miller." (ECF No. 83 at 116.)

Warden Baca's duties as warden do not include making housing assignments or medical decisions whether it be medications, treatments, tests and labs, or medical classifications as to housing restrictions. (ECF No. 66-1 at 107-110.) However, Miller asserted in a response to a request for interrogatory that "Warden Isidro Baca ordered [him] to reassign [Morris] to unit 7B." (ECF No. 83 at 139.)

Caseworker Conlin was the caseworker in administrative segregation at the time of the incident and Morris contends he asked Conlin at every available opportunity about his bunk assignment, while Conlin claims Morris did not. (ECF No. 76 at 7; ECF No. 66-1 at 103.) As a caseworker, Conlin would have had access to an inmate's health classification through the NOTIS system. (ECF No. 65 at 7.) Morris submitted seven kites from October 2017 until January 2018, prior to his fall on February 2, 2018, which did not address his top tier/top bunk situation. (ECF No. 66 at 54-60.)

## III.  LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law applicable to the claim or claims determines which facts are material. *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Only disputes over facts that address the main legal question of the suit can preclude summary judgment, and factual disputes that are irrelevant are not material. *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at 248.

The parties subject to a motion for summary judgment must: (1) cite facts from the record, including but not limited to depositions, documents, and declarations, and then (2) "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Documents submitted during summary judgment must be

authenticated, and if only personal knowledge authenticates a document (i.e., even a review of the contents of the document would not prove that it is authentic), an affidavit attesting to its authenticity must be attached to the submitted document. *Las Vegas Sands, LLC v. Neheme*, 632 F.3d 526, 532-33 (9th Cir. 2011). Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish the absence or presence of a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute. *Soremekun*, 509 F.3d at 984. "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. However, if the moving party does not bear the burden of proof at trial, the moving party may meet their initial burden by demonstrating either: (1) there is an absence of evidence to support an essential element of the nonmoving party's claim or claims; or (2) submitting admissible evidence that establishes the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 593-94 (9th Cir. 2018); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). If the moving party does not meet its burden for summary judgment, the nonmoving party is not required to provide evidentiary materials to oppose the motion, and the court will deny summary judgment. *Celotex*, 477 U.S. at 322-23.

Where the moving party has met its burden, however, the burden shifts to the nonmoving party to establish that a genuine issue of material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, (1986). The nonmoving must "go beyond the pleadings" to meet this burden. *Pac. Gulf Shipping Co.*

*v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (internal quotation omitted). In other words, the nonmoving party may not simply rely upon the allegations or denials of its pleadings; rather, they must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. *See* Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 586 n. 11. This burden is "not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). The non-moving party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Pac. Gulf Shipping Co.*, 992 F.3d at 898 (quoting *Oracle Corp. Sec. Litig.*, 627 F.3d at 387). Mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

When a *pro se* litigant opposes summary judgment, his contentions in motions and pleadings may be considered as evidence to meet the non-party's burden to the extent: (1) contents of the document are based on personal knowledge, (2) they set forth facts that would be admissible into evidence, and (3) the litigant attested under penalty of perjury that they were true and correct.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

Upon the parties meeting their respective burdens for the motion for summary judgment, the court determines whether reasonable minds could differ when interpreting the record; the court does not weigh the evidence or determine its truth. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015). The court may consider evidence in the record not cited by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3). Nevertheless, the court will view the cited records before it and will not mine the record for triable issues of fact. *Oracle Corp. Sec. Litig.*, 627 F.3d at 386 (if a nonmoving party does not make nor provide support for a possible objection, the court will likewise not consider it).

## IV.   DISCUSSION

### A.   Civil Rights Claims Under 42 U.S.C. § 1983

42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135 1139 (9th Cir. 2000)). The statute "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and therefore "serves as the procedural device for enforcing substantive provisions of the Constitution and federal statutes." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Claims under section 1983 require a plaintiff to allege (1) the violation of a federally-protected right by (2) a person or official acting under the color of state law. *Warner*, 451 F.3d at 1067. Further, to prevail on a § 1983 claim, the plaintiff must establish each of the elements required to prove an infringement of the underlying constitutional or statutory right.

### B.   Claim I - Eighth Amendment – Deliberate Indifference to Serious Medical Needs

The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency" by prohibiting the imposition of cruel and unusual punishment by state actors. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation omitted). The Amendment's proscription against the "unnecessary and wanton infliction of pain" encompasses deliberate indifference by state officials to the medical needs of prisoners. *Id.* at 104 (internal quotation omitted). It is thus well established that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 105.

Courts in Ninth Circuit employ a two-part test when analyzing deliberate indifference claims. The plaintiff must satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1066

(9th Cir. 2014) (internal quotation omitted). First, the objective component examines whether the plaintiff has a "serious medical need," such that the state's failure to provide treatment could result in further injury or cause unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Serious medical needs include those "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell*, 763 F.3d at 1066 (internal quotation omitted).

Second, the subjective element considers the defendant's state of mind, the extent of care provided, and whether the plaintiff was harmed. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation omitted). However, a prison official may only be held liable if he or she "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1050, 1057 (9th Cir. 2004). The defendant prison official must therefore have actual knowledge from which they can infer that a substantial risk of harm exists, and also make that inference. *Colwell*, 763 F.3d at 1066. An accidental or inadvertent failure to provide adequate care is not enough to impose liability. *Estelle*, 429 U.S. at 105–06. Rather, the standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other. . ." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Accordingly, the defendants' conduct must consist of "more than ordinary lack of due care." *Id.* at 835 (internal quotation omitted).

Moreover, the medical care due to prisoners is not limitless. "[S]ociety does not expect that prisoners will have unqualified access to health care…." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Accordingly, prison officials are not deliberately indifferent simply because they selected or prescribed a course of treatment different than the one the inmate requests or prefers. *Toguchi*, 391 F.3d at 1058. Only where the prison officials' "'chosen course of treatment was medically unacceptable under the circumstances,' and

was chosen 'in conscious disregard of an excessive risk to the prisoner's health,'" will the treatment decision be found unconstitutionally infirm. *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). In addition, it is only where those infirm treatment decisions result in harm to the plaintiff—though the harm need not be substantial—that Eighth Amendment liability arises. *Jett*, 439 F.3d at 1096.

### 1.    Analysis

In Claim I, Morris asserts a claim for deliberate indifference to serious medical needs related to the treatment of his back. As to the objective element of this deliberate indifference claim, the parties do not dispute that Morris's back issues constitute a serious medical need. Thus, the Court finds that the objective element of deliberate indifference has been satisfied.

As to the subjective element, Defendants assert they were not deliberately indifferent to Morris's serious medical needs and Morris has no evidence that surgery was deemed appropriate by a medical provider any time prior to the fall that occurred on February 2, 2018. (ECF No. 65 at 8-17.) However, confusingly, Defendants acknowledge that an MRI conducted in <u>March of 2016</u> indicated Morris needed surgery for his back pain. (*Id.* at 11; ECF No. 68-1 at 40, 43; ECF No. 68-5 at 10.) Morris disputes that Defendants have established Morris received adequate medical care in relation to his back and asserts that Defendants have failed to show that waiting to perform surgery until it was needed on an emergency basis was not deliberate indifference. (*See* ECF No. 83.)

First, the medical records provided by Defendants are properly authenticated under Fed. R. Evid. 901 through the declaration submitted by Health Information Coordinator, Erin Kruse. (ECF No. 65-1.) However, aside from defense counsel's own opinion or interpretation of those medical records and/or medical diagnoses, Defendants do not provide any further evidence, such as declarations from medical professionals regarding Morris's medical treatment, responses to interrogatories, etc., to support their position. The Court cannot consider either in form or substance, defense counsel's own personal opinions or interpretations concerning any medical diagnoses or records in its

1    decision. Further, the medical records provided by Defendants are mostly illegible and

2    appear to only cover a limited time-period. (*See* footnote 5, above.) Thus, it is unclear to

3    the Court that Morris's medical needs were, in fact, adequately addressed. On this basis

4    alone, the Court finds Defendants have failed to meet their initial burden of establishing

5    that no material issue of fact exists as to the claim.

6        However, even assuming Defendants' materials were fully legible, in reviewing

7    what the Court can from the medical records provided, the Court finds that a genuine

8    issue of material fact exists as to whether the chosen course of treatment was medically

9    acceptable under the circumstances and whether the treatment was chosen in conscious

10   disregard of an excessive risk to Morris's health. The records before the Court seem to

11   indicate that although surgery appears to have been recommended as far back as March

12   of 2016, surgery was not provided to Morris until after his fall in February 2018, at which

13   point surgery was performed on an emergency basis. Defendants acknowledge that an

14   MRI conducted in March of 2016 indicated Morris needed surgery. Thus, the Court has

15   concerns about whether the delay in providing surgery was medically acceptable under

16   the circumstances. Further, it is unclear to the Court whether the chosen course of

17   treatment, which appears to be rather conservative in nature, was medically acceptable

18   under the circumstances. Because Defendants do not address these issues or provide

19   admissible evidence to address these issues, there is a factual dispute as to whether the

20   chosen treatment and delay in surgery were medically acceptable under the

21   circumstances.

22       Finally, Defendants argue Morris is unable to prove that Defendants knew of a

23   serious medical need and disregarded the excessive risk to this health. However, given

24   all of the above, it is possible for a jury to find that the chose course of treatment and

25   delay in providing surgery were chosen in conscious disregard of an excessive risk to

26   Morris's health.

27       Because Defendants do not provide the Court with sufficient evidence to show that

28   they were not deliberate indifferent to Morris's serious medical needs as it relates to

treatment of his back, the Court finds Defendants failed to meet their initial burden of establishing that no material issues of fact exist as to Morris's claim. Further, the Court cannot say as a matter of law or fact that Defendants were not deliberately indifferent to Morris's serious medical needs, which ultimately resulted in him undergoing emergency surgery and suffering further medical problems. Accordingly, summary judgment should be denied as to Morris's claim that Defendants were deliberately indifferent to his serious medical needs.[8]

### 2.    Qualified Immunity

The Eleventh Amendment bars damages claims and other actions for retroactive relief against state officials sued in their official capacities. *Brown v. Oregon Dept. of Corrections*, 751 F.3d 983, 988–89 (9th Cir. 2014) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)). State officials who are sued individually may also be protected from civil liability for money damages by the qualified immunity doctrine. More than a simple defense to liability, the doctrine is "an entitlement not to stand trial or face other burdens of litigation . . ." such as discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

When conducting a qualified immunity analysis, the Court asks "(1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established." *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). A right is clearly established if it would be clear to a reasonable official in the defendant's position that his conduct in the given situation was constitutionally infirm. *Anderson v. Creighton,* 483 U.S. 635, 639–40, (1987); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012). The Court may analyze the elements of the test in whatever order is appropriate under the circumstances

---

[8]    To the extent Defendants argue a lack of personal participation as to Aranas, Mar, and Mitchell, the Court also finds genuine issues of material fact exist as to their personal involvement in treating Morris, for many of the same reasons discussed above.

of the case. *Pearson*, 555 U.S. at 240–42.

"[J]udges of the district courts… should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "[W]hether a constitutional right was violated… is a question of fact." *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009). While the Court decides as a matter of law the "clearly established" prong of the qualified immunity analysis, only the jury can decide the disputed factual issues. *See Morales v. Fry*, 873 F.3d 817, 824-25 (9th Cir. 2017); *Reese v. Cty. Of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018). While the Court finds a genuine issue of material fact exists as to whether Morris's constitutional rights were violated, the Court will address the "clearly established" prong at this time.

Defendants contend they are entitled to qualified immunity because "Morris has not alleged and cannot demonstrate that there exists a clearly established right to any specific medical treatment, based upon an unproduced recommendation for surgery, other than the significant treatment that he received." (ECF No. 65 at 14-15.)  According to Defendants, there must be a case directly on point directing medical professionals within the prison setting to provide a certain course of treatment. This position has expressly been rejected by the Supreme Court and the Ninth Circuit. It is not required that there be a case directly on point before concluding that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "For a right to be clearly established it is not necessary that the very action in question have previously been held unlawful." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "To define the law in question too narrowly would be to allow defendants to define away all potential claims." *Jackson*, 90 F.3d at 332 (citing *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995)).

Defendants' argument that Morris failed to identify which clearly established law

each Defendant violated is unconvincing. Morris alleges that the delay in providing a recommended back surgery constituted deliberate indifference. It is settled law that deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment. *Jackson*, 90 F.3d at 332 (9th Cir. 1996) (citing *Estelle*, 429 U.S. at 104). Specifically, it is settled law that choosing a course of treatment that is medically unacceptable under the circumstances and is chosen in conscious disregard of an excessive risk to an inmate's health is a constitutional violation. *Toguchi*, 391 F.3d at 1058 (citing *Jackson*, 90 F.3d at 332). Further, intentionally delaying access to medical care or intentionally interfering with treatment once it is prescribed can constitute deliberate indifference. *See Estelle*, 429 U.S. at 104-05. Thus, the constitutional right was clearly established such that reasonable prison officials would have known that intentionally delaying or interfering with treatment constitutes unlawful deliberate indifference. Accordingly, the Court finds that the constitutional right is clearly established, and Defendants are not entitled to qualified immunity.

### C.   Claim II - Eighth Amendment – Deliberate Indifference to Serious Threats to Inmate's Safety

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. MO Chapman*, 452 U.S. 337, 347 (1981). "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

To establish a violation of these duties, the inmate must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834. Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met. *See id.* at 834.

When an inmate claims prison officials failed to take reasonable steps

to protect him, he must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citations omitted). This is a question of fact, and "must be decided by the jury if there is any room for doubt." *Lemire v. Cal. Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citation omitted). "[T]o satisfy the objective prong, it is enough for the inmate to demonstrate that he was exposed to a substantial risk of some range of serious harms; the harm he actually suffered need not have been the most likely result among this range of outcomes." *Id.* at 1076 (citing *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1193 (9th Cir. 2002)). It does not matter "whether a prisoner faces an excessive risk ... for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

The inmate must also satisfy the subjective element. This means that the prison official being sued must have known of and disregarded the risk to the inmate's safety. *Farmer*, 511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). Further, a plaintiff "must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries." *Lemire v. California*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citing *Conn v. City of Reno*, 591 F.3d 1081, 1098-1101 (9th Cir. 2010), *vacated by City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *reinstated in relevant part* 658 F.3d 897 (9th Cir. 2011).

Defendants do not contest that Morris satisfies the objective element, as the risk of harm due to falling from a top bunk due to a medical condition is an objectively serious risk of harm. (ECF No. 65 at 19.) However, Defendants contest that Morris can meet the subjective element, as he must demonstrate more than mere negligence. (*Id.*) Morris opposes Defendants' motion for summary judgment and also files his own cross-motion for summary judgment as to the unsafe prison conditions claim. (ECF No. 83.) In his cross-motion for summary judgment, Morris asserts that based upon undisputable evidence, Miller and Conlin were deliberately indifferent to Morris's serious medical needs and that indifference was the contributing and proximate cause of the injuries suffered by Morris resulting in his fall down the stairs on February 2, 2018. (*Id.* at 69-74.)

First, the Court finds that placing Morris on the top tier, top bunk despite having medical restrictions constitutes deliberate indifference. *See e.g., Lewis v. Endell*, No. 2:08-CV-00157-RLH-PAL, 2008 WL 4866316 at *6 (D. Nev. Nov. 7, 2008) (finding for qualified immunity purposes that it was clearly established that failure to move an inmate with seizure disorder to a lower bunk for seven months was deliberate indifference) (citing *Estelle*, 429 U.S. at 99 (doctor ordered prisoner moved from upper bunk to lower bunk to avoid injury)); *Ramos v. Monteiro*, No. CV 06-0832-GAF (JTL), 2009 WL 1370998 at *14-15 (C.D. Cal. May 14, 2009) (finding that plaintiff had adequately alleged that, based on his medical condition, an upper bunk posed a substantial risk to his safety to support a claim of deliberate indifference).

The undisputed facts before the Court establish that Morris has consistently had a lower bunk/lower tier medical disability noted since his initial intake into the NDOC on October 19, 1999. The undisputed facts establish that on October 6, 2017, Morris was transferred to a cell located on the top tier and on the top bunk. The undisputed facts further establish that on February 2, 2018, while being escorted from the top tier, Morris fell down the stairs and suffered injuries that required emergency surgery. Whether the failure to provide Morris with a lower tier/lower bunk to accommodate his medical problems was done with knowledge that there was a valid medical order in existence, is the subject of a genuine dispute of material fact. Further, there is a genuine dispute of material fact as to who was responsible for assigning housing.

Morris's assertion is that Baca, Miller, and Conlin knew, or should have known, that there was medical classification requiring he be housed on a lower tier/lower bunk and that the Defendants were all responsible for housing assignments; Baca, Miller, and Conlin state they were not involved in assigning housing or were otherwise unaware of Morris's medical restriction. It is not the Court's role to weigh conflicting evidence or make credibility determinations, but only to determine whether there is a genuine issue of material fact for trial. *Summers*, 127 F.3d at 1152. Accordingly, because the Court finds that genuine issues of material fact exist that preclude summary judgment, the Court

1  recommends that motions for summary judgment (ECF Nos. 65, 83) be denied.

2      **D.    Exhaustion of Administrative Remedies**

3          In addition to the arguments asserted above, Defendants also argue that summary

4  judgment should be granted because Morris failed to exhaust his administrative remedies

5  as to his second claim for relief. (ECF No. 65 at 22-24.) Defendants assert that "[a] review

6  of Morris's grievance records shows that he grieved the bunk issue at the informal level

7  but failed to appeal the decision to the First or Second level." (*Id.* at 23.)

8          Morris filed an informal grievance, # 2006-30-63488 on May 25, 2018, and sought

9  to "not be housed upstairs." (ECF No. 66 at 29-31.) His informal grievance was <u>granted</u>

10 on September 20, 2018, stating "An alert Warning has been added along with a

11 corresponding case note in relation to this grievance to ensure you are not housed on a

12 top tier bed assignment in the future." (*Id.* at 27.) Despite that Morris's grievance was

13 granted, in its entirety, Defendants argue that because Morris is pursuing "money

14 damages and extraordinary relief," he was required to complete the PLRA exhaustion

15 process. (ECF No. 65 at 24.)

16          Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought

17 with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by

18 a prisoner confined in any jail, prison, or other correctional facility until such administrative

19 remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is

20 mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). The requirement's underlying

21 premise is to "reduce the quantity and improve the quality of prisoner suits" by affording

22 prison officials the "time and opportunity to address complaints internally before allowing

23 the initiation of a federal case. In some instances, corrective action taken in response to

24 an inmate's grievance might improve prison administration and satisfy the inmate, thereby

25 obviating the need for litigation." *Id.* at 524–25. The PLRA requires "proper exhaustion"

26 of an inmate's claims. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Proper exhaustion

27 means an inmate must "use all steps the prison holds out, enabling the prison to reach

28 the merits of the issue." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing

*Woodford*, 548 U.S. at 90).

Administrative Regulation ("AR") 740 governs the grievance process at NDOC institutions. An inmate must grieve through all three levels: (1) Informal; (2) First Level; and (3) Second Level. (*See generally* ECF No. 66-1 at 22-37.) However, AR 740.03.6(C) states: "[i]f the Grievance is "**Granted**" at any level, the grievance process is considered complete and the inmate's administrative remedies exhausted, and the inmate cannot appeal the decision to a higher level." (*Id.* at 26.)

A review of the authenticated evidence shows that Morris filed an informal grievance regarding the claims asserted in the complaint, which was <u>*granted*</u>. Pursuant to AR 740, when his informal grievance was granted, Morris successfully completed the grievance process and exhausted his administrative remedies. Defendants seem to contend that because Morris seeks a different form of relief in this lawsuit than he sought in his grievance, that this means he failed to exhaust. However, Defendants fail to cite to any binding authority that supports this assertion. Thus, the Court finds that the Defendants have not shown Morris failed to exhaust before initiating this action.

**V.    CONCLUSION**

For good cause appearing and for the reasons stated above, the Court recommends that Defendants' motion for summary judgment, (ECF No. 65), be denied and Morris's cross-motion for summary judgment, (ECF No. 83), be denied.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## VI.    RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendants' motion for summary judgment, (ECF No. 65), be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Morris's cross-motion for summary judgment, (ECF No. 83), be **DENIED**.

**DATED**: _December 14, 2021_____.

_____
**UNITED STATES MAGISTRATE JUDGE**